IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 18-cv-00409-RBJ

YVETTE PENTLAND,

      Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY,
SCHLUMBERGER TECHNOLOGY CORPORATION, and
SCHLUMBERGER GROUP LIFE, ACCIDENTAL DEATH & DISMEMBERMENT AND
BUSINESS TRAVEL ACCIDENT PLAN,

      Defendants.

---

### ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

---

This matter is before the Court on plaintiff's motion for judgment on the administrative record, or, alternatively, for summary judgment. ECF No. 42. For the reasons discussed below, plaintiff's motion is DENIED, and judgment is entered in favor of the defendants.

## I. FACTUAL BACKGROUND

The following facts are taken from the administrative record. Tony Pentland ("decedent") was a Schlumberger employee and was insured under a group life insurance plan ("group plan") administered by defendant Metropolitan Life Insurance Company ("MetLife"). ECF No. 43-1 at 1. As a part of the group plan Mr. Pentland elected basic and supplemental life insurance coverage. In September 2015 Mr. Pentland was diagnosed with terminal cancer and went on disability leave. ECF No. 43-5 at 2. Mr. Pentland remained eligible for life insurance

1

coverage under the group plan while on disability.  On the last day he worked Mr. Pentland was insured for $126,000 in basic life insurance and $200,000 in supplemental life insurance under the group plan. ECF No. 43-1 at 140.

On November 30, 2015 Mr. Pentland emailed Sheri Jordan, also a Schlumberger employee, to ask if he could enroll in benefits for the 2016 year despite being on disability.  ECF No. 43-5 at 7.  Ms. Jordan responded to Mr. Pentland and stated "[a]n exception has been made to allow you to enroll in your 2016 benefits.  Your benefit elections were made according to the elections submitted on your 2016 enrollment form.  Attached is a copy for your review." *Id*. The attachment to that email stated that Mr. Pentland had basic life insurance coverage in the amount of $126,000 and supplemental life insurance in the amount of $325,000.  ECF No. 43-1 at 141.  On September 5, 2016 Mr. Pentland again emailed Sheri Jordan and asked if he would be able to enroll in benefits despite still being on disability.  ECF No. 43-5 at 21.  Ms. Jordan replied "[a]s long as you continue to make your benefit payments you will be mailed a packet towards the end of the year to elect your benefits for 2017." *Id*.  Mr. Pentland continued receiving benefits through the 2017 calendar year.  The group plan contained an actively-at-work requirement which states, "If You complete the enrollment process . . . such insurance will take effect . . . on the date You become eligible for such insurance if You are Actively At Work on that date."  ECF No. 43-1 at 38.

However, on March 30, 2017 Mr. Pentland was terminated as a result of being on long-term disability for twelve months.  ECF No. 43-4 at 148.  The group plan permitted employees to convert their coverage to an individual policy in the event their life insurance under the group

plan ended or was reduced.  ECF No. 43-1 at 58.  The relevant provisions outlining this

conversion option read,

**LIFE INSURANCE: CONVERSION OPTION FOR YOU**

If Your life insurance ends or is reduced for any of the reasons stated below, You have
the option to buy an individual policy of life insurance ("new policy") from Us during the
Application Period in accordance with the conditions and requirements of this section . . . .

You will have the option to convert when:

A. Your life insurance ends because:
- You cease to be in an eligible class;
- Your employment ends;
- This Group policy ends, provided You have been insured for life insurance
  for at least 5 continuous years; or
- This Group policy is amended to end all life insurance for an eligible class
  of which You are a member, provided You have been insured for at least 5
  continuous years. . . .

If your life insurance ends or is reduced for any other reason, the maximum amount of
insurance that You may elect for the new policy is the amount of Your life insurance
which ends under this Group policy.

*Id*. at 58–59.

After Schlumberger terminated Mr. Pentland, MetLife Transitions Solutions sent Mr.

Pentland a letter stating that his coverage under the group plan ended on March 30, 2017, the

same day he was terminated.  ECF No. 43-1 at 192.  MetLife further informed Mr. Pentland that

he was able to convert his policy under the group plan to an individual policy.  ECF No. 43-5 at

9.  The letter from MetLife states

As the insurance carrier for your group life coverage, we understand that you have
experienced a change of benefits provided through Schlumberger.  This change is
effective 3/30/2017, and at that time your life insurance benefits will end or be reduced.
You have some options and we would like to help you with these time sensitive and
important decisions.  Please look at the chart below to see which coverage is eligible for
Conversion, Portability, or both . . . .

3

| Coverage Type | Amount Eligible for Conversion |
|---|---|
| Basic Life | $207,000 |
| Optional Life | $525,000 |
| Spouse Dependent Life | $160,000 |
| Child Dependent Life | $15,000 |

*Id.*

In this same letter MetLife also included the contact information for the financial professional who could help Mr. Pentland convert his coverage under the group plan: "[w]e have arranged for financial professionals with Massachusetts Mutual Life Insurance Company (MassMutual) to help explain your options, if you choose, since MetLife cannot provide you with individual guidance." *Id.* Mr. Robert Lucke, a MassMutual employee, assisted Mr. Pentland and plaintiff with converting his group plan coverage to an individual policy. The individual policy, dated May 1, 2016, states that the "face amount of insurance" was $732,000. ECF No. 43-3 at 63. The individual policy's payment provision states that "[w]hen the insured dies, an amount of money, called the insurance proceeds, will be payable to the beneficiary. The insurance proceeds are the total of: The Face Amount of Insurance . . ." *Id.* at 66.

After electing an individual conversion policy in the amount of $732,000, plaintiff emailed Mr. Lucke on May 15, 2017 to confirm the details of the new policy. ECF No. 43-5 at 12. That email reads, "Hi and happy Monday. Just so I am clear . . . sorry this is all new . . . if I am approved and [Tony] passes next month, would I be covered for the full $732k provided premiums were paid?" *Id.* Mr. Lucke responded, "[y]es, his off roll date was 3/30, so the new policy would be effective 32 days later, May 2nd. You gave me a voided check, so when the policy is set up they will take the May premium." *Id.* at 11. In her declaration, plaintiff writes

"[b]ecause he was sick and knew he was dying, Tony and I contacted MassMutual and ultimately converted his coverage to an individual policy with a face value of $732,000, despite the high monthly cost." *Id*. at 4.

Mr. Pentland died on November 15, 2017 after a twenty-eight-month battle with cancer. ECF No. 43-3 at 135. Following his death, plaintiff filed a claim with MetLife to collect the insurance proceeds under the individual policy. However, on December 12, 2017 MetLife sent a letter to Yvette indicating that the individual policy had been rescinded because the group plan was still in effect. ECF No. 43-1 at 19. That letter states

> This policy was issued as a result of a conversion option on [Tony Pentland's] group life insurance through his employer, Schlumberger. When [Mr. Pentland] separated from the company on 3/30/2017, he was disabled due to illness. Under the terms of this group policy, the group coverage remains in effect for an extended period of time when the individual is disabled prior to separation.
>
> The individual policy was issued on 5/1/2017. We have reviewed the terms of the group policy and found that the group coverage was still in effect under the original contract at the time of [Mr. Pentland's] death. There is no change to the death benefit payable. . . . However, as the conversion to the individual policy was not necessary in this instance, enclosed please find a check for $11,945.64, which represents a refund of the premiums paid, plus interest, from the date of issue.

*Id*. Accordingly, MetLife did not pay the $732,000 amount under the individual policy. MetLife did not cite to any specific provision of the group policy to support its decision to rescind the individual policy. It also did not explain or mention the policy's actively-at-work requirement.

Once the claim was submitted to MetLife, several employees began working on plaintiff's claim and noticing irregularities. Jessica Prievo, a senior claims examiner in the Group Life Claims division, wrote, "I am currently reviewing a claim that was received in our office for a former Schlumberger employee by the name of Tony Pentland. . . . The information received in our office indicates that there was a conversion notice sent to [Mr. Pentland] from

MetLife Transitions Solutions indicating that the Group Coverage terminated or reduced on

March 30, 2017." *Id*. at 192.  On December 15, 2017 Jason Longo, another MetLife employee,

wrote "[w]e think they potentially allowed this person to receive increases while not actively at

work, hence allowing them to cover a lot more that should have been in effect." *Id*.  at 182.  On

that same date, yet another MetLife employee wrote,

> I am reviewing a waiver claim for this insured, and we also received . . . a conversion notice, that has higher amounts on it than the premium waiver claim.  Waiver claim was approved for basic-$126,000 and Optional $200,000, the conversion form has $207,000 for basic and $525,000 for the optional, can you please verify if the insured ever went back to work? If he was still considered disabled was he eligible for increases?

*Id*. at 12–13.  On December 18, 2017 Nancy Chartier, a MetLife employee, explained to Ms.

Pentland in a phone call why MetLife rescinded the individual policy.  Following this

conversation, Ms. Chartier emailed Ms. Prievo and stated

> [Yvette Pentland] will be calling the group unit for additional information as to why group did not advise her that the group policy would be payable if Mr. Pentland died w/in one year of the issue date of the individual life policy.  [Plaintiff] said the only thing she got from group (or Schlumberger) was confirmation of premium waiver on the group policy.  She is looking for language that confirms the group policy and not the individual life policy, would be paid out if [Tony Pentland] died within a certain period of time after leaving his employer.  We don't have that language in our policy.

ECF No. 43-2 at 9.

Following this communication, plaintiff retained a lawyer to assist her in processing her

claim with MetLife.  On January 3, plaintiff's attorney sent MetLife an email demanding that

MetLife honor the individual policy and pay plaintiff $732,000.00.  ECF No. 43-3 at 114.  The

demand letter reads, "[o]n November 11, 2017, when Mr. [Pentland] passed away, [the

individual policy] was in force, and there is no provision in the policy that allows MetLife to

rescind the policy on the basis that the policy was unilaterally deemed to be unnecessary by

MetLife only after Mr. [Pentland's] death." *Id*. at 114.  On January 10, 2018 Ms. Chartier again

emailed Ms. Prievo and wrote

> Does the Group Unit, or the Employer administrator have any correspondence to the
> insured or document, that states if the insured opts to convert his group coverage to an
> individual life policy when he terminates from the employer, that the employer's group
> coverage remains in effect for a certain (?) period of time.  [A]nd, if the insured dies
> within that period of time, the group coverage is paid and the Individual life policy is
> lifted.???

> I would think the insured would have been advised and need some documentation to
> provide to the attorney who is demanding the PLI policy for 732,000.00 be paid out.

ECF No. 43-2 at 8.

Following these communications MetLife rescinded the individual policy and determined

the group policy was still in effect.  Because MetLife only paid plaintiff $326,066.99, the amount

under the group policy, plaintiff filed suit to recover $406,000, the difference between the group

policy and the individual policy.

## II. PROCEDURAL BACKGROUND

Plaintiff filed her complaint against MetLife on February 20, 2018.  ECF No. 1.  On April

4, 2018 MetLife filed its answer.  ECF No. 8.  Plaintiff initially alleged that the Court had

diversity jurisdiction, and defendants argued that ERISA was the basis for the Court's

jurisdiction.  ECF No. 1, 8.  After the parties fully briefed the issue, the Court held that this case

was in fact governed by ERISA.  *See* ECF Nos. 12–18.

On May 16, 2019 plaintiff filed an amended complaint that listed MetLife, Schlumberger,

and the group plan as defendants.  ECF No. 19.  On June 20, 2019 defendant MetLife filed its

answer to the amended complaint.  ECF No. 23.  On August 23, 2019 defendant Schlumberger

filed its answer.  ECF No 26.  On July 17, 2020 plaintiff filed a motion for judgment on the

administrative record, or, alternatively, for summary judgment.  ECF No. 42.  Defendant

MetLife produced the administrative record on July 17, 2020.  ECF Nos. 43-1– 43-5.

Defendants filed their response to plaintiff's motion on August 14, 2020.  ECF No. 44.  Plaintiff

filed her reply on August 31, 2020.  The matter has therefore been fully briefed and is ripe for

review.

### III. STANDARD OF REVIEW

**A. <u>Denial of Benefits Claim</u>**

In *Firestone Tire & Rubber Co. v. Bruch*, the Court stated that ERISA denial of benefits

claims are "to be reviewed under a *de novo* standard unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan."  489 U.S. 101, 115 (1989).  An abuse of discretion standard—

also known as the arbitrary and capricious standard—is appropriate when plan administrators

have discretionary authority.  *Id*.

Here, there is no dispute that the group plan vested the plan administrator with

discretionary authority.  The plan's "Authority of MetLife" section states,

> MetLife has been delegated the discretionary authority and responsibility for determining
> benefits under the Plan, all as described above in this section. . . . In Processing claims
> and appeals, MetLife has the discretionary authority to interpret the provisions of the Plan
> and to interpret the facts and circumstances of claims for benefits.  No benefits will be
> paid under the Plan unless MetLife decides in its sole discretion you are entitled to them.
> Any decision made by MetLife on appeal (or on a second voluntary appeal if you choose
> to file one) is final and binding, unless you file suit under ERISA.

ECF No. 43-1 at 114.  Despite the plan administrator's having discretionary authority, plaintiff

argues that the *de novo* standard of review should apply for two reasons.  First, plaintiff contends

that the denial of benefits letters did not comport with ERISA's transparency requirements.

Second, plaintiff argues that Texas law governs the group plan and prohibits discretionary clauses in group life insurance policies.  ECF No. 42 at 5.  Defendants do not address either argument.

### 1. Procedural Irregularities

An administrator's failing to comply with ERISA requirements can result in procedural irregularities that warrant the less deferential *de novo* standard of review.  The Tenth Circuit has found that procedural irregularities warrant a *de novo* standard of review when the plan administrator does not comport with ERISA's timeliness requirement or fails to issue a decision on a claim altogether.  *See Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818 (10th Cir. 2008) (The less deferential de novo standard of review applies where plan administrator failed to issue a decision on claimant's appeal.); *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) ("…there were procedural irregularities here—MetLife's failure to comply with ERISA-mandated time limits in deciding [plaintiffs'] administrative appeal—that require us to apply the same de novo review that would be required if discretion was not vested in MetLife."); *Gilbertson v. Allied Signal, Inc.* 328 F.3d 625,631 (10th Cir. 2003) (held that a plan administrator is not entitled to a deferential standard when they fail to issue an opinion on the claimant's appeal).  This case involves neither MetLife's failing to timely render a decision, nor its failing to render any decision whatsoever.

Plaintiff argues that the procedural irregularities are (1) MetLife's failure to point to a specific plan provision in its first denial letter, and (2) both denial letters not being "written in a manner calculated to be understood by Yvette."  ECF No. 42 at 5.  Plaintiff is correct that ERISA

requires a plan administrator "to provide a claimant with the specific reasons for the claim denial." *Spradley v. Owens-Illinois Hourly Employees Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012). In addition to providing a claimant with specific reasons for denial, the Department of Labor's implementing regulations require that the denial notice contain "the specific reason or reasons for the adverse determination *and reference to the specific plan provisions on which the determination is based*." *Id*. at 1140 (citing 29 C.F.R. § 2560.503-1(g)) (emphasis added).

Here, although the first letter did not contain any specific policy provision, the second letter did. Additionally, plaintiff's argument that the second letter was not written in a manner in which plaintiff could understand is unavailing. MetLife sent the second letter after plaintiff retained counsel and addressed it to plaintiff's attorney. Furthermore, plaintiff has presented no case law—nor could this Court find any—suggesting that procedural irregularities such as the ones at issue here warrant a more deferential standard of review. The procedural irregularities that plaintiff asserts therefore do not require the Court to temper its deference.

   2. Whether Texas Law Applies

Plaintiff next argues that a de novo standard of review should apply because "the group plan is governed by the laws of the State of Texas, which has enacted a ban on discretionary clauses in group life insurance policies." ECF No. 42 at 5. ERISA expressly preempts state laws relating to employee benefit plans but does not preempt state laws regulating insurance. *Compare* 29 U.S.C. § 1144(a), *with* 29 U.S.C. § 1144(b)(2)(A). Tex. Ins. Code § 1701.062(a) states "[a]n insurer may not use a document . . . in this state if the document contains a discretionary clause." Here, plaintiff implies that the Texas law is not preempted because it is a

law that regulates insurance.  In *Ariana M. v. Humana Health Plan of Texas, Inc.*, the Fifth

Circuit interpreted Texas's ban on discretionary clauses and held that the provision "only renders

discretionary clauses unenforceable; it does not attempt to prescribe the standard of review for

federal courts deciding ERISA cases."  884 F.3d 246, 250 (5th Cir. 2018).  Plaintiff contends that

if the provision is unenforceable, then a de novo standard of review must follow.  ECF No. 42 at

6.

  The Court does not reach the merits of plaintiff's argument because there is no governing

law provision in the administrative record stating that Texas law applies.  The only page

referencing Texas is a page that says Texas is the plan's situs state.  ECF No. 43-1 at 157.

Listing Texas as the situs state is not the same as listing Texas law as the governing body of law

for non-preempted issues.  Plaintiff attempts to introduce the governing law provision by citing

to *Hofland v. Schlumberger Tech. Corp.*, another ERISA case involving Schlumberger, where

the administrative record did contain the policy's governing law provision.  However, the Court

is confined to the administrative record and cannot assume that the plan at issue in *Hofland* is

identical to the one at issue here.  Accordingly, because there is no governing law provision in

the administrative record, the Court need not analyze the preemption issue and finds that the

arbitrary and capricious standard applies.

  Notably, however, the standard of review—whether the appropriate standard is arbitrary

and capricious or de novo—is not dispositive in this case.  The resolution of this case is

determined by application of the provisions of the group plan.  Thus, the foregoing discussion of

alleged procedural irregularities and the Texas statute is not material to the outcome here.

## B. "**Summary Judgment**"

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Typically, the moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In *LaAsmar v. Phelps*, 606 F.3d 789 (10th Cir. 2010), an ERISA case in which both parties moved for summary judgment, the court stated, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." In this case, plaintiff moved for judgment on the administrative record or, alternatively, for summary judgment. Defendant did not file a cross-motion for summary judgment, but implicitly, the defendant is also seeking judgment on the administrative record. Judgment on the administrative record is, in substance, what this Court is rendering, regardless of the label placed on it.

## IV. ANALYSIS

Plaintiff moves for judgment on the administrative record to recover benefits allegedly due under the individual life insurance policy. In the event her motion for judgment on the administrative record is denied, plaintiff also moves for summary judgment on her breach of fiduciary duty claim.

## A. **Denial of Benefits Claim**

To date, defendants have paid plaintiff $326,066.99 for her life insurance claim.  ECF No. 43-1 at 125.  Plaintiff argues that she should have received $732,000, the value of the individual policy.  ECF No. 42 at 16.  Defendants argue that the individual policy is invalid because the group policy was converted to an individual policy in error.  ECF No. 44 at 6.  Defendants also contend that the amount insured under the individual policy runs contrary to the group plan's terms, and the plan only permitted Mr. Pentland to convert his pre-disability benefits amount of $326,000 even if conversion to an individual policy had been allowed.  *Id*. at 14.

1. Whether defendants' rescission of the individual policy was arbitrary and capricious

The first issue the Court must determine is whether MetLife's decision to rescind the individual policy was arbitrary and capricious, a deferential standard that is a "difficult one for a claimant to overcome."  *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002).  Under the arbitrary and capricious standard, the administrator's decision will be upheld "so long as it is predicated on a reasoned basis" and supported by substantial evidence.  *Adamson v. Unum Life Ins. Co. of Am.,* 455 F.3d 1209, 1212 (10th Cir. 2006).  Substantial evidence means "more than a scintilla but less than a preponderance."  *Rekstad v. U.S. Bancorp.,* 451 F.3d 1114, 1119–20 (10th Cir. 2006).  When reviewing the plan administrator's decision, the Court "may only consider the evidence and arguments that appear in the administrative record."  *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).  Additionally, the Court can "consider *only* the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious."  *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th

13

Cir. 2007), abrogated on other grounds by *Metro. Life Ins. Co. v Glenn*, 554 U.S. 105, 128

(2008) (emphasis added).

To determine which specific rationales a plan administrator asserted, courts look "only to

those rationales that were specifically articulated in the administrative record as the basis for

denying a claim." *Id.* 29 U.S.C. § 1133(1) states that claim denials must "set forth the specific

reasons for such denial, written in a manner calculated to be understood by the participant."

Furthermore, the implementing regulations require the plan administrator to cite to a specific

provision within the plan as the basis for his or her decision. 29 C.F.R. § 2560.503–1(g). Courts

have explained the rationale for this rule as "[w]e will not permit ERISA claimants denied the

timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact

plan interpretations devised for purposes of litigation." *Flinders*, 491 F.3d at 1191 (citing *Marolt

v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998)).

I therefore look to the claim denial letters to determine whether MetLife's asserted

rationales were arbitrary and capricious. As mentioned above, MetLife sent two claim denial

letters to plaintiff. The first did not cite to a specific plan provision as the basis for its decision.

That letter read

> The policy was issued as a result of a conversion option on [Tony Pentland's] group life
> insurance through his employer, Schlumberger. When [Tony Pentland] separated from
> the company on March 30, 2017, he was disabled due to illness. Under the terms of the
> group policy, the group coverage remains in effect for an extended period of time when
> the individual is disabled prior to separation. . . .
>
> We have reviewed the terms of the group policy and found that the group coverage was
> still in effect under the original contract at the time of [Tony Pentland's] death. There is
> no change to the death benefit payable.

*ECF No. 43-2* at 7. The second letter cited to a policy provision that states

14

> If You obtain a new individual conversion policy because Your life insurance ends or is reduced and You later become eligible to have insurance continued under the section entitled ELIGIBILITY FOR CONTINUATION OF CERTAIN INSURANCE WHILE YOU ARE TOTALLY DISABLED, We will only continue Your life insurance under such section if the conversion policy is returned to Us.

*Id*. at 25.  The letter applied the cited provision to the claimant's situation and explained

> [the decedent] was eligible to continue Group Policy due to his Total Disability therefore the Individual Policy was not a valid Policy.  An individual policy is issued at the time the employee last works while their information is reviewed to see if they qualify for their coverage to continue under the terms of the Group Plan due to their total disability. Once it is determined that the Group Life Insurance would continue due to a Total Disability the Individual Policy would need to be rescinded.

*Id*.

The "Initial Determination" section of the policy states, "[i]f MetLife denies your claim in whole or in part, the notification of the claims decision will state the reason why your claim was denied and reference the specific Plan provision(s) on which the denial is based."  ECF No. 43-1 at 81.  The first letter was not a determination according to the plan because it did not reference a specific provision of the policy.  *Id*.  I therefore consider the second denial letter—the one sent to plaintiff's counsel that referenced a specific policy provision—to be the claim denial letter that contains MetLife's decision and reasoning.

a. Arbitrary and Capricious Analysis

When applying the arbitrary and capricious standard to a plan administrator's decision to deny benefits, courts look to whether the decision "(1) was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan." *Spradley*, 686 F.3d at 1140 (quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004)).  Taking the above factors into account, I find that MetLife's decision to rescind the

individual policy—based on the rationale in the second denial letter—was not arbitrary and capricious.

MetLife's reason for denying plaintiff's claim is that Mr. Pentland was never eligible for the individual policy because his group coverage never ended. As MetLife explains in its second denial letter, "Tony Pentland was eligible to continue his Group Policy due to his Total Disability therefore the Individual Policy was not a valid policy. Once it is determined that the Group Life Insurance would continue due to Total Disability the Individual Policy would need to be rescinded." ECF No. 43-2 at 7. The letter's explanation complies with the plan's terms. The term's plan states "[i]f You become Totally Disabled while You are insured for Continuation Eligible Insurance under this policy you may qualify to continue certain information under this section." ECF No. 43-1 at 63. Mr. Pentland had continuation eligible insurance under the group policy at the time he became totally disabled, and that coverage therefore continued until his death.

The plan further states "[f]or the purposes of this section, Continuation Eligible insurance means basic life insurance and supplemental life insurance . . . *to the extent that such insurance was in effect for You on the date Your Total Disability began*." *Id*. (emphasis added). Here, on the date Mr. Pentland's total disability began his group policy was in effect for $126,000 in basic life insurance and $200,000 in supplemental life insurance. Therefore, Mr. Pentland was only entitled to $326,000 in continuation eligible insurance after he became totally disabled. Because the administrator's decision is supported by the plan's terms, the Court finds that the administrator's determination was the result of a reasoned and principled process, albeit plagued by mistakes made by both Schlumberger and MetLife, as discussed below.

The second factor—whether the determination is consistent with prior interpretations—further lends itself to finding that the administrator acted reasonably. Plaintiff argues that MetLife's two denial letters provided different reasons for its denial. I disagree. The first letter states that the group coverage remained in effect because Mr. Pentland was disabled prior to separation. ECF No. 43-2 at 7. Meanwhile, the second letter reiterates this point and says that "Tony Pentland was eligible to continue his Group Policy due to his Total Disability therefore the Individual Policy was not a valid policy." *Id*. at 25. While the words slightly differ between the two letters, the subject of the letters is the same—the individual policy is invalid because Mr. Pentland's benefits continued under the group plan as a result of his disability. Additionally, and most importantly, the administrator's reasoning has also been consistent with the plan's terms. I therefore find that this factor also weighs in favor of finding that the determination was not arbitrary and capricious.

The third factor directs the Court to look to external standards in determining whether an administrator's decision was reasonable. While the Tenth Circuit does not clearly delineate which standards courts may consider, case law suggests that courts may look to legal standards outside the purview of ERISA. *See Phelan v. Wyoming Associated. Builders*, 574 F.3d 1250, 1258 (10th Cir. 2009) (demonstrating that the district court's reliance on state law contract principles was appropriate at this stage of analysis). Here, I look to "ERISA's backdrop," the common law of trusts. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 294 (citing *Beck v. Pace Int'l* Union, 551 U.S. 96, 101 (2007)); *See also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1984) (explaining that in the

ERISA context "Congress invoked the common law of trusts to define the general scope of [the administrator's] authority and responsibility.").

Plan administrators, like trustees, have a duty to provide complete and accurate information to beneficiaries. Section 173 of the Restatement (Second) of Trusts states, "[t]he trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature . . . of the trust property." Comment (c) to that same section states, "[a]lthough the terms of the trust may regulate the amount of information which the trustee must give . . . the beneficiary is always entitled to such information as is reasonably necessary to help him enforce his rights . . . ."

MetLife did not provide plaintiff or decedent with complete or accurate information, nor did it give them the information that the terms of the plan required. MetLife sent decedent a letter stating that her husband's group coverage ended or was reduced when he was terminated, and that he was eligible to convert his group coverage to an individual policy. ECF No. 43-5 at 9. The letter also contained the amounts he was eligible to convert under the group policy, which were incorrect according to the plan's terms. *Id*. *See* Part IV.A.2 *infra*. MetLife directed the decedent to work with one of their contractors, a MassMutual employee, who conveyed the same incorrect conversion amounts to the decedent and plaintiff.[1] The MassMutual employee then converted the coverage according to these incorrect amounts. ECF No. 43-5 at 11. When

---

[1] The administrative record explains the relationship between MetLife and MassMutual as follows: "[t]he MassMutual financial professionals involved in the PlanSmart program were affiliated with MetLife until July 2016, when MMLIC acquired MSI Financial Services, Inc. MetLife continues to administer the PlanSmart program, but has arranged with MassMutual to have these specially-trained financial professionals offer financial education and provide personal guidance to employees and former employees of firms providing PlanSmart through MetLife." ECF No. 43-5 at 10.

plaintiff asked for assurance that she would be entitled to these proceeds should her husband die, the MassMutual employee promptly responded, "Yes . . . the new policy would be effective . . . May 2nd." *Id*.

Mrs. Pentland, relying on both MetLife's and MassMutual's representations, thus believed she would be entitled to the $732,000 covered under the individual policy when her husband died. Mrs. Pentland was permitted to believe this for seven months because MetLife did not review the validity of the individual policy—or whether Mr. Pentland was eligible for continued coverage under the group policy—until after Mr. Pentland died. MetLife did not act timely, did not review its contracted employee's work for accuracy, and in fact sent a letter confirming that Mr. Pentland was eligible for benefits that they now claim are not owed to him. MetLife's conduct when addressing plaintiff's claim was astoundingly careless. Nothing about MetLife's conduct in this case comported with the standards cited above. Thus, this factor weighs in favor of finding MetLife's determination arbitrary and capricious.

The Court finds that the fourth factor—whether the administrator's decision was consistent with the purpose of the plan—is inconclusive. While the purpose of ERISA plans is to provide beneficiaries and dependents with affordable health and life insurance coverage, that purpose is not necessarily undermined when an administrator denies benefits. *See Phelan*, 574 F.3d at 1258 ("While the purpose of the plan might be to provide affordable group health insurance benefits for eligible employees, not every decision that results in the denial of an insured's benefits conflicts with that purpose."); *see also Varity Corp. v. Howe*, 516 U.S. 489 (1996) ("[A] fiduciary obligation, enforceable by beneficiaries seeking relief for themselves, does not necessarily favor payment over nonpayment . . .").

Although the third *Spradley* factor supports a finding that MetLife's rescission of Mr. Petland's individual policy was arbitrary and capricious, the Court finds that the first and second factors weigh more heavily in favor of finding that the administrator's decision was reasonable. The decision was plainly supported by the plan's terms, and the determination process was therefore reasoned and principled. Further, both of the administrator's communications with the plaintiff were consistent. Both letters explained that Mr. Pentland's group policy remained in effect because of his total disability status. Finally, and perhaps most importantly, the terms of the plan control, and defendant MetLife acted in accordance with the plan. The Court finds that the administrator's decision was "predicated on a reasoned basis" and "is supported by substantial evidence." *Adamson v. Unum Life Ins. Co. of Am.,* 455 F.3d at 1212. Although I have found that MetLife did not abuse its discretion, I nevertheless consider the parties' remaining arguments.

2. Whether MetLife's $326,066.99 payment was reasonable

Plaintiff argues that MetLife must pay plaintiff the remaining $406,000.00 under the individual policy. ECF No. 42 at 16. Defendants argue that even if the individual policy remained in effect and was not rescinded, plaintiff would still only be entitled to $326,066.99 per the terms of the plan. ECF No. 44 at 14. I agree with defendants.

ERISA plan administrators are obligated "to manage ERISA plans in accordance with the documents and instruments governing them." *Kennedy*, 555 U.S. at 288 (citing 29 U.S.C. § 1104(a)(1)(D)); *Ellis v. Liberty Life Assurance Co. of Bos.*, 958 F.3d 1271, 1278 (10th Cir. 2020) ("ERISA requires every benefit plan to be fully described in written plan documents that govern the management of the plan by plan administrators."); *see also Egelhoff v. Egelhoff ex rel.*

*Breiner*, 532 U.S. 141, 147 (2001).  Thus, a beneficiary's claim "stands or falls by the terms of the plan."  *Kennedy*, 555 U.S. at 300.  This rule is meant to ensure certainty of result and to prevent plan administrators from "examin[ing] a multitude of external documents that might purport to affect the dispensation of benefits."  *Id*. at 301.  For ease of administration, "the plan, in short is at the center of ERISA."  *U.S. Airways v. McCutchen,* 569 U.S. 88, 101 (2013).  Therefore, in this case—as in all cases governed by ERISA—the explicit terms of the plan govern the amount to which plaintiff is entitled.

Plaintiff argues that the individual policy should be honored in its entirety.  Defendants counter that even if the individual policy were valid, the plan's terms only permitted the decedent to convert his pre-disability elected benefits amounts, or $326,000.  Defendants point to the following provisions in the plan:

> For disabled employees as described in ELIGIBILITY FOR CONTINUATION OF CERTAIN INSURANCE WHILE YOU ARE TOTALLY DISABLED, Your benefit amount is determined by taking the higher of your Eligible Compensation as of September 1 of the previous year prior to the date of Your disability or the previous year's Admissible Compensation prior to most recent annual enrollment.

ECF No. 43-1 at 25.  The next relevant provision outlines the type of benefits for which a "totally disabled employee" may be eligible.  It reads,

> If You become Totally Disabled while You are insured for Continuation Eligible Insurance under this policy, You may qualify to continue certain insurance under this section.  If continued, premium payment will not be required.  We will determine if You qualify for this continuation after We receive Proof that You have satisfied the conditions of this section. . . .
>
> For the purposes of this section, "Continuation Eligible Insurance" means
>
> - Basic Life Insurance, and
> - Supplemental Life insurance, if You were insured for Supplemental Life insurance for 12 months before Total Disability began;

*to the extent that such insurance was in effect for You on the date Your Total Disability began.*

*Id.* at 63 (emphasis added).

The Court finds the above two provisions unambiguous. Under the terms of the group plan, a totally disabled participant as defined by the plan may have his benefits continued without payment of premiums. In such a situation the benefit amount will be determined by looking at the participant's eligible compensation from either the year before his disability began or the year before the one in which he last enrolled in benefits. The administrator will use whichever of the two amounts is higher. The second provision states that if a claimant becomes totally disabled while receiving continuation eligible insurance—also known as basic and supplemental life insurance—the administrator will determine continued eligibility for those benefits. Here, Mr. Pentland was eligible to continue his basic and supplemental life insurance once he went on disability. At the time that Mr. Pentland became totally disabled his elected benefit amounts were $126,000 in basic life insurance and $200,000 in supplemental life insurance. ECF No. 43-1 at 140. Thus, $326,000 was the amount of coverage "in effect for [Mr. Pentland] on the date [his] Total Disability began." *Id.*

While Schlumberger permitted Mr. Pentland to participate in the open enrollment process and elect benefit increases while on disability, those increases only take effect when a decedent returns to work. The plan states, "[i]f You complete the enrollment process . . . such insurance will take effect . . . on the date You become eligible for such insurance *if You are Actively at Work on that date*." ECF No. 43-1 at 38 (emphasis added). Here, Mr. Pentland did not return to work after electing the increased benefits amounts, and according to the plan's terms, those

22

increases therefore never took effect.  As a result, when Mr. Pentland was terminated on March

30, 2017 his eligible life insurance coverage under the group plan was still $326,000.

I now turn to the policy provision that allegedly gave Mr. Pentland the option to convert

his group benefits to an individual policy.  It reads,

> If Your life insurance ends or is reduced for any other reason [than the Policyowner's
> organizational restructuring], *the maximum amount of insurance that You may elect under*
> *the new policy is the amount of Your life insurance under the Group Policy.*

*Id*. at 59 (emphasis added).  On March 30, 2017 decedent's employment with Schlumberger

terminated as a result of his being on long-term disability for a year.  According to the letter

MetLife sent notifying him of his conversion option, his insurance under the group plan ended on

that same date (although under the policy's terms, it did not).  Therefore because Mr. Pentland's

insurance allegedly ended due to his disability, and not organizational restructuring, he was only

entitled to convert "the amount of [his] life insurance under the Group Policy," which was

$326,000.  *Id*.

MetLife's handling of plaintiff's claim (compounded by Schlumberger's own mistakes)

is exactly the type of slipshod conduct that can give the insurance industry a bad rap.  If I could

rule the other way, I would.  Its shoddy conduct resulted in emotional distress to the plaintiff that

never should have happened, and one wonders whether MetLife or Schlumberger has even felt

any sense of responsibility for the harm they caused.  Nevertheless, I am bound by ERISA and I

must decide this issue according to the terms of the plan.  The Court holds that the plan

administrator acted in accordance with its duty to follow the terms of the plan when it paid out

$326,066.99.  Plaintiff's motion for judgment on the administrative record is therefore DENIED.

**B**. **Breach of Fiduciary Duty Claim**

Plaintiff moves this Court to grant summary judgment on her breach of fiduciary duty claim in the event her motion for judgment on the administrative record is denied. Plaintiff argues only that Schlumberger, not MetLife, breached its fiduciary duty when communicating with Mr. Pentland about the plan. ECF No. 42. Specifically, she asserts that Schlumberger breached its fiduciary duty when it led Mr. Pentland to believe that he was eligible to elect benefits despite being on disability. Schlumberger argues that its communication with Mr. Pentland was entirely consistent with the plan, and therefore, no breach occurred. ECF No. 44 at 18.

The Tenth Circuit has not clearly outlined the test courts should apply to determine whether a fiduciary breached its duties in the ERISA context. In *Kerber v. Qwest Grp. Life Ins. Plan*, the Tenth Circuit considered various tests that other circuits have adopted; however the court did not say which one should apply. 647 F.3d 950, 968 ("In this case, we need not determine what version of the test to adopt."). Instead of choosing among the tests, the *Kerber* court held that to succeed under any of the tests, a plaintiff must demonstrate that the fiduciary made a material misrepresentation. *Id.* Here, plaintiff has not demonstrated that Schlumberger made a material misrepresentation, and her breach of fiduciary duty claim against Schlumberger must therefore fail.

Plaintiff contends that Schlumberger made a material misrepresentation when it authorized Mr. Pentland to participate in open enrollment and to elect increased benefits while he was on disability in 2015 and 2016. ECF No. 42 at 12. Plaintiff's argument assumes that her husband's election of increased benefits was improper. Plaintiff states, "[i]f MetLife is correct that such increases were improper, Schlumberger materially misled Tony about his coverage, and

24

Schlumberger breached its fiduciary duty for telling Tony it had made an exception in his case."
*Id*. at 14.  As defendants correctly point out, however, decedent's participation and election of
increased benefits were not improper.  ECF No. 44 at 18.  Their taking effect was simply
predicated on his returning to active work status.  In her response plaintiff then argues that
Schlumberger breached its fiduciary duty by failing to convey to the decedent that his benefits
increases would not take effect unless he returned to active work status.  ECF No. 45 at 5.

Both the Tenth Circuit and this court have addressed whether a fiduciary has a duty to
communicate the actively at work requirement to participants of ERISA-governed plans.  Both
courts agree that while claimants must be on notice of the actively-at-work requirement, such
notice exists so long as the requirement is explained in the plan documents.  For example, in
*Horn v. Cendant Operations, Inc.*, the administrator denied plaintiff's benefit increases because
she never returned to active work status.  69 F. App'x 421 (10th Cir. 2003) (unpublished).  While
the *Horn* court held that defendant breached its fiduciary duty by failing to disclose the actively
at work requirement, it based its decision on the fact that plaintiff never received a copy of the
plan, and that the document plaintiff did receive failed to mention the requirement.  *Id*. at 428.  In
its reasoning, however, the court acknowledged that the terms of a plan typically control.  *Id*.

Similarly, in *Shafer v. Metro. Life Ins. Co.* a judge in this district expressly rejected the
precise argument that plaintiff makes here.  No. 14-cv-00656-RM-KMT, 2015 WL 4055473 at
*7 (D. Colo. July 2, 2015).  There the plaintiffs argued that the fiduciary breached its duty
because they were not advised of any return to work policy, nor of any impacts on their
coverage.  Judge Raymond Moore denied plaintiffs' claim and held that the decedent had notice

of the actively at work requirement through its inclusion in the policy documents they received. *Id*.

The facts at issue here align with those in *Schafer*.  Plaintiff does not contest that she or decedent received a copy of the plan prior to her filing a claim with MetLife.  She also does not contest that the documents she received included the actively at work requirement.  ECF No. 43-1 at 38 ("If you complete the enrollment process . . . such insurance will take effect as follows: if You are not required to give evidence of Your insurability, such insurance will take effect on the date you become eligible for such insurance if You are Actively at Work on that date).  The terms of the plan control, and thus both decedent and plaintiff were on notice of the actively at work requirement when they received the plan documents.  Plaintiff has provided no evidence of a material misrepresentation by defendant Schlumberger.  She is therefore not entitled to judgment as a matter of law.[2]  Accordingly, plaintiff's motion is DENIED.

---

[2] Moreover, as defendants have noted, the <u>administrative record</u> contains no evidence that Mr. Pentland was capable of returning to work after he became totally disabled.

**ORDER**

Plaintiff's motion for judgment on the administrative record, or in the alternative summary judgment (ECF No. 42), is DENIED.

DATED this 9th day of February, 2021.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge